To my right is Marilyn Venter. She's the attorney for the remaining appellants, with the exception of my husband, Aziz Venter. I'd like to remove about five minutes for rebuttal. And due to the number of legal issues that we have raised in this appeal, I'm going to predominantly rely on our opening and reply briefs. I believe to try to address all the different issues would just be too difficult for both all of you and me. The facts are complex. They cover quite a few years. And I believe they're set out most succinctly in our second amended complaint, which is docket number 80-1, because we are proceeding on the original district court record. I believe it's also included in the supplemental excerpts of record by the appellees. I think this case, one point that's important to address is the issue of standing. I know that it was of concern to the district court, and I believe we have addressed it sufficiently in our briefs. But I just wanted to touch on it briefly. The assertion of lack of standing for the children is especially concerning, that the district court would find that and make a dismissal of prejudice as to the children's claims. The children have, in the second amended complaint, stated very specifically claims that are distinct and separable, that are only as to them, rather than myself and my husband as the other appellants. And the district court took the unusual step of not ensuring that the children had a conflict-free representative. We made a motion to appoint a next friend, because there was some issue as to the fact that us as parents, under Johns v. County of San Diego, would not be allowed to represent our minor children. We would need to have an attorney for that. So we made a motion to have a next friend appointed, whether it be Ms. Gunther, the attorney, or the paternal relatives that are also named as appellants. And the district court rejected that and denied that motion, which was the magistrate judge, which was adopted by the district court judge. And the concern is this. The minor children should have their interests properly represented. And if there was any issue as to whether there was a conflict between ourselves, the paternal relatives, or Ms. Gunther representing the children, then at a minimum, the district court should have held a hearing, asked for information, gone further to make sure the children's interests were adequately protected, because the claims were clearly stated in the complaint. There's no doubt about that. And also the concern is it was a dismissal with prejudice. It's interesting when you look at the report, first report and recommendation by Magistrate Judge Benton. She recommends dismissal for all the different claims that she references, with the exception of the ones that remained, that were later disposed of on summary judgment. She never says in the report and recommendation, she never recommends dismissal with prejudice. She recommends dismissal, but not with prejudice. And I think the case law is quite clear. I already don't believe they should have been dismissed at all, but then dismissed with prejudice because the children are minors. They, of course, when they turn 18, have the right to come back and file their own claims. So a dismissal with prejudice essentially forecloses their right. From here, you know, there's never a chance for them to come back and follow through with the claims. And the claims we're talking about are not minor issues. The children were taken from their home. Then they were handed over to abusive and neglectful individuals by the State of Washington Department of Social Health Services. That agency is supposed to be there to protect children, to maintain family integrity, keep families together, if at all possible. And instead, they put them in the hands of people that they knew, they knew were abusive and neglectful. And, in fact, one of the foster homes where they were put, there had been a death of a child. That family, the house was red-flagged on the Department of Social and Health Services' SCOMAS. So these are not minor things, and what happened to the children, there has been no discipline to the people who were responsible for their placements. Rather, they've received promotions. And, in fact, one of the key cases that encompasses not only the children's claims, but also the social workers and those who worked with them, is Miller v. Gammie. And I'm aware that, Judge Reimer, you were on the panel on that decision, so I'm sure all three of you are very aware of the holding there. And the concern is this. When the first report and recommendation was entered by the magistrate, Judge Benton, Miller v. Gammie had not been decided. We came back later and asked that the district court judge reconsider that first report and recommendation adoption, which was done by another district court judge, look at it in light of Miller v. Gammie. The district court judge said that he did look at it, but he said that it wouldn't change the initial decision on the first report and recommendation. I believe that's wrong, and we've clearly argued that in our briefs, both opening and reply. In fact, Miller v. Gammie, I'd like to point out a few specifics. The discussion of Antwon v. Byers and Anderson, Inc. and Klena v. Fletcher. There is a quote that says, Even actions taken with court approval or under a court's direction are not in and of themselves entitled to quasi-judicial absolute immunity. And that was quoting Antwon and Miller. The court is supposed to examine all the different functions that were performed, and there were a wide variety of different issues that were raised here factually, so there were many different functions that need to be analyzed that weren't. And when it comes to discretionary decisions and recommendations of social workers, Miller v. Gammie made a point that those things have to be looked at. And another quote, Examples of such functions may include decisions and recommendations as to the particular home where a child is to go or as to the particular foster parents who are to provide care. And that such placements may not be judicial or prosecutorial decisions of the type that would have enjoyed common law absolute immunity. So even though we tried to re-raise this issue, once Miller v. Gammie was decided, the district court still stuck with its initial decision. Because of the intervening Supreme Court authority that Miller v. Gammie recognized, I think this case falls squarely within the ambit of Miller v. Gammie. There is no blanket immunity, and the functions performed should be analyzed.  I think it's a deal with the social workers. Do they pertain only to the children's claims, or do they pertain to your claims as well? Actually, both. They pertain to both as far as the claims against the social workers. But some things, some of the great many of the issues seem to be time-barred, except that because if the children were involved, presumably the time bar went off. And again, we addressed the statute of limitations and time bar issue in the opening reply brief, but I think the reason why the statute of limitations was something that the district court bought into is because there was a misinterpretation of the second minute complaint and time frames. One example that's referenced in our brief is a therapist that was referenced early in the complaint. They misunderstood it to be the named therapist, which was one of the defendants. And so the time period they were looking at was back in 1994. But in fact, that therapist was not sued. It was a therapist that came into play later on. And you also have to look at the fact that there was considerable discovery that was concealed by the Department of Social and Health Services that's detailed in the second minute complaint. They were sanctioned for it by the state superior court judge. They were to turn over all the information. We had a huge discovery process. But during that time was the first time, which was in 1997, that we first learned of the abuse and neglect of the children, the concealment of all the records and things that we had been requested the entire time that the dependency proceedings were going on. And so I think the statute of limitations, it's just been an issue of misunderstanding the complaint and time frames. I don't believe the statute of limitations was exhausted. And you also have the continuing violations doctrine, because this was a period of things that happened over a period of time, and there hasn't been an end to it. It's been a continuing violations. And again, we argued the continuing violations doctrine in the brief. Another issue that I wanted to just briefly touch on is immunity. And while it's a long-established legal doctrine, and there are different immunities we're talking about in this case because we have judges, we have social workers, we have therapists, we have a variety of different individuals that all come together that are tied together in the conspiracy claims. You have to admit in its basic concept, when you talk about just immunity without distinguishing and putting factual scenarios, its basic concept defies common sense. The ordinary layman is going to say, if somebody did something wrong, if somebody harmed somebody, they should be held to account. They should suffer the consequences. The old golden rule, do unto others as you would have them do unto you. But, of course, there are cases where individuals may forgive and forget. There's a balance in the ordinary walk of life. And on the surface, it appears the legal system is trying to strike a balance also when it comes to giving judges, giving social workers, giving individuals who have to make difficult decisions, the discretion to do what they believe is right in the time that they're in. But at the same time, that discretion can be abused. It can be exploited to the point of taking an abuse of power, the power that they're given, that they're entrusted to, to take care of the duties that they have under the state statutes. It's abuse, and in this case, it was seriously abused. And I understand that in law, when there's a clearly established principle, a direct frontal assault on that fortified position is usually not going to work. But I believe under the case law, and the argument that we've made in the briefs, immunity doesn't apply even under the law as it stands now. And we've stated the reasons why. And I think what has come about in the argument that's been made implicitly and explicitly by the appellees is the fact that it's kind of like to err on the side of the child. Even if we were wrong, even if we did things incorrectly, you know, we were trying to protect the children. But the law is clear that, you know, they may adopt that in their own policies and doing things day to day, but it's not according to the law. It's against the Constitution, both state and federal law. And decisional law, as we cited in our opening reply briefs covering police officers, is quite clear. I think the law governing social workers and those therapists and, you know, the people that are usually involved in these types of proceedings has become to broaden in the same sense as the police officers, where we see clear decisional law on what's allowed and what's not. And although Miller v. Gamme and some of the later cases were decided after our case was first filed, I definitely believe that they're applicable. We still have the case here, and the Court has the opportunity to take the time and relook at what the district court did. I don't believe that they could have read Miller v. Gamme, as well as the second minute complaint, and made the decision that there shouldn't have been changes as to the first report and recommendation that was adopted. I would say that the tide does seem to be changing when it comes to Washington State dependency and termination law. There are a lot of changes in the state statutes that have been made since the events took place that are contained in our complaint. For example, the proceedings used to be closed when our state proceedings were going on. Now that they've opened them, while in a limited capacity, they are open. There's also more restrictions on seizing children in the first place. They get the state patrol involved much more. But I don't think that that is enough to say, okay, well, they're fixing it. The legislature is addressing these problems. You know, let's leave it to the legislature and move on. Because there's still considerable work to be done on implementing both the recent and the laws that were already in place. Because children are thrust into state care, and sadly, it's known through the state of Washington how bad of a record the Department of Social and Health Services has for lawsuits against them. And liability for both children, adults, all the individuals in our society who are disadvantaged and unable to speak for themselves. And these are the only ones that are publicized. Just to close. I'm sorry? At this point, you're suing for damages only, is that right? Actually, we're asking for damages and objective relief. I believe all the different things that we're asking for are set out in the prayer of relief at the end of the second amended complaint. But insofar as you're asking for objective relief, you certainly run into Ricker-Feldman and other problems. Because you have to be undoing the state law. Well, I think on Ricker v. Feldman, as we address in our briefs, I think Brokaw v. Weaver from the Eighth Circuit, I think that's really a case directly on point as to the Ricker-Feldman doctrine. So I would say my answer would be to review that case rather than go into all the details. And I think I'll reserve the rest of my time unless anyone else has questions right now. Certainly, Mr. Farber. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. I'm Bob Hargreaves. I'm Assistant Attorney General, Washington State Attorney General's Office in Olympia. It's not the defendant appellee's intent to divide oral argument time this morning, but I want to point out that all of the other defendant appellee's counsel are present in the Court and are prepared, if the panel has any specific questions of them, that they can answer them if I'm not able to. Seated with me at counsel's table is John Kopp from the King County Prosecutor's Office representing the King County defendants. We asked that you. Because there's so much here, maybe it would be helpful if I told you a few things that I'm interested in. Yes, Your Honor. One is, why isn't at least part of the argument about the children standing correct, i.e., why don't the children have standing and why at least should they be able to dismiss it without prejudice, and what about the appointment of next grant? That's one. Two is, what about the Miller v. Gami question across the board? And three, and this wasn't addressed in the opening argument, what about the sort of to the side but interesting problem about when the jailing with respect to wearing the religiously required clothing? Those are three things that interest me. I'm sorry, Your Honor. Those are three things that interest me. The jailing with respect to? Wearing her veil. I see. Yes. Okay. Let me address those then for you, Your Honor. And in fact, I had indeed intended to address the Miller v. Gami in the other arguments that I was going to make, in which I also wanted to address the other change in the law since the decisions were made below, and that would be the Rooker v. Feldman scope of applicability once the Exxon Mobil case was decided in 2005. So I'll address that as well. On the standing issue, Your Honor, in the first instance, I think it bears remembering that under Washington law, once the terminate, once parental rights are terminated, the parents have absolutely no legal standing whatsoever to sue by or on behalf of their children. And certainly, well into the early stages, by the time this lawsuit was commenced, the termination of parental rights had occurred with respect to the first five of the children, and shortly thereafter with respect to the other two. As a result, ongoing dependency and termination proceedings started before this litigation started. Would you understand the disposition here to preclude one of the children after they turn 18 from filing a lawsuit? Your Honor, as it might reflect or as it might be grounded in claims about how they were treated in foster care, absolutely not. What about the termination? They were represented during the termination, Your Honor, by Gardens and Elijah. So, you know, I believe it's safe to say that they would be precluded at some juncture from bringing claims about the termination proceedings themselves, but certainly not with respect to their treatment in foster care. And that's because even though it the dismissal was with prejudice, it doesn't apply. Why not? That was in the Federal court when they were attempting to be made plaintiffs to this case. I'm you know, I certainly couldn't speak for whatever State court judge might entertain their claims in the future, but I would be hard-pressed to make a case. And also, I don't know whether the representation was correct, but the representation was that there was a motion made for appointment of a next friend, anybody. It didn't have to be the parents, just whomever. I think the motion was made to appoint either Ms. Gunther or the Moroccan relatives. Or someone else? I think it was limited to just the other. That's how it was addressed in the disposition below. And certainly, the Court was, I think, absolutely correct in determining that under the Miller case, there was a definite conflict of interest there that included any possible representation, even if you assumed that the children had standing in this case, which is another issue when we're looking at the nature of the claims that were being brought. The nature of the claims here were with respect to the termination. As I said before, the children were represented in those proceedings with their own guardians at Leiden in the State court proceedings, where it was determined that their best interests were to be removed and had their parental rights terminated. But in any event, the – with respect to the appointment of a next friend or a guardian in the Federal District Court, two things to remember. Number one, they were being represented – they were proposed to be represented by Ms. Gunther, who had represented the plaintiffs in the dependency and termination proceedings, so there's an obvious conflict there. And the foreign relatives also appeared to be, again, with Ms. Gunther as their counsel. And from the claims that were being asserted, it was – it was apparent that they were also aligned with the interests of the parents, which were, again, not consistent with those of the children as found by the State court proceedings. And the other thing I'd like to point out about the standing issue is that, in fact, this whole business about whether or not they could bring the children into Federal District Court as plaintiffs is – there should be a stop in raising that, because that was the same issue that was decided in the first Federal District Court case, which this Court then affirmed on appeal. So there should be a stop in raising that issue. And in what manner did they try to do it at that point? In what manner did they do it at that point? I don't know. In the same manner that they tried to do it here, Your Honor. They were named as plaintiffs in the first Federal District Court case. The issues in that case involved – Was there a motion for appointment of an ex-friend? I don't believe there was. That's not the same manner. It's a different manner. Okay. But they were – but they were dismissed as parties as having not – as being without standing to proceed. Well, the part of this I don't understand is the assertion that children don't have a standing in a constitutional sense if they were properly in the court. Leaving aside anything else about this, to assert a – an interest in the parental relationship. That seems to be implicit in the ruling, and that's what bothered me the most. I think the simple answer to that, Your Honor, is that they were not properly in the court, because they were only in the court because the parents, who have absolutely no legal right to bring them into the court, were trying to make that happen. Your Honor, if I might then move on to the issue of – I'm taking a new turn, as you were interested in it – the interest of – Let me interrupt you there and see if I am correct on the procedure. The complaint was filed in pro se, and the complaint included the children and the foreign relatives as parties. Yes, Your Honor. The court issued an order to show cause, saying the pro se can't represent other people. Following that, was there then a second complaint filed, and their children were represented in that? Yes, Your Honor. And the way it worked was this. They filed their complaint pro se initially with one IFP, form of papyrus application. It was that that the court said was defective. So show cause by coming back in and either – and, oh, by the way, you cannot represent the children as either pro ses or as their parents. And to remedy that, then what they did was they came back in and filed – and the court also said, and the foreign relatives can't be represented by you. They need to have their own attorney, or they need to sign a complaint in a pure pro se. And with their own IFP application. So with that show cause order, then – and that was in April of 2000. In June, they came back in and lodged a First Amendment complaint, and that's when Marilyn Gunther appeared, ostensibly for the children and the foreign relatives. And then the Sakhwans individually each filed their own IFP applications. However, when Ms. Gunther appeared for the children and the foreign relatives, she paid the filing fee. Or there was a filing fee paid. I'm not sure who paid it, but it was paid at that time. And the district court then dismissed the IFP applications as moot, and the case proceeded on. And that was in June of 2000. Does that answer your question? Yes. Now, if I might get back to the issue of the social worker immunity under Miller Begani, and I would point out as well that the social workers that we're talking about, having been given immunity initially under Babcock v. Tyler, which we'll talk about whether or not that's appropriate under the relook under Miller Begani, were also dismissed under the Rooker-Feldman. So the claims against them were also dismissed under Rooker-Feldman, which will bring us back into that. I'll segue back into that when I conclude. But in Miller Begani, of course, the Court said we can't just go by what was announced at Babcock. We just, if they're somehow connected with the proceedings, they're entitled to absolute immunity. We look at their function. And, of course, the functions that were traditionally accorded absolute immunity, like quasi-judicial or quasi-prosecutorial or advocacy or witness, those are still entitled to absolute immunity under that case and under the other cases of this district, like Myers v. Contra Costa County and Cloverdale and so on. And with everything else, it's qualified immunity, where if you have a demonstration of a violation of a clearly established constitutional right and a State official who probably knew they were violating the law when they did whatever they did, then they're not entitled to qualified immunity. Otherwise, they are. But here, when you look at the plethora of claims that they brought against these social workers, they run the gamut from everything from deciding to initiate the proceedings, accepting custody from the King County police officers when they were seized initially, involving themselves in the abuse investigation that was part of the first dependency proceedings, medical care, therapy, and other functions. When you look at all these, you start parsing them out. Number one, the decisions to engage or to initiate the dependency proceedings, that's the same type of quasi-prosecutorial immunity or quasi-prosecutorial functions. It's entitled to absolute immunity under this Court's decision in Meyer v. Contra Costa County. Likewise, decisions to, or actions to effect court orders, like removals, and every one of these removals of the children, other than the first one, which were done by King County police, were all done pursuant to court orders. So if they're executing court orders, they're again entitled to absolute immunity under this Court's decision in Coverdale. When you look at accepting those first children from the King County police, after they were removed, when the autopsy revealed that the child whose death precipitated all this died as a result of physical abuse, and the police went out and in the interest of protecting the remaining children, who ranged in age from one to five years old, they took them into custody under a statute that allows that, there is a statute then under 1334060 of RCW that says that they shall be placed in shelter care, pending a shelter care hearing, when that's how they're removed. So you have a social worker who accepts the children under a State law that says you will do this and places them into shelter care. Again, the SOPLONs had no, have not demonstrated how any of this violates any under the dictated State law, could reasonably believe that their actions were lawful and, therefore, they should be entitled to qualified immunity. And I would cite the court to Caldwell v. Lefebvre, 928 2nd, 333, another Ninth Circuit decision, that supports that rationale. And the same is true with all the other allegations against the social workers in this case. Now, again, as I mentioned, the social workers were all dismissed on the basis that their claims against them are under Rooker-Feldman doctrine. And I think it's beyond any dispute that this case really is a collateral attack on those dependency and termination proceedings below. Look at the relief they're asking for. Well, suppose they weren't. Suppose they were only asking for damages. Suppose they were only asking for damages. Okay. So if that were the case, then certainly under this Court's decision in Gilbertson there was just a request for damages. That's not a Rooker-Feldman case. No, but what it does here is it brings up the issue of how, then, would we address this. Under Rooker-Feldman, I'm not aware of it being dependent on what relief was being sought. That was the extension issue. Well, it seems to be conceptually extremely important because the question in Rooker-Feldman is how you're trying to vacate the State court judgment. If you're not trying to vacate the State court judgment but simply get another form of relief, then why does Rooker-Feldman apply? I see. Well, I think Rooker-Feldman, I think the cases say that Rooker-Feldman applies if the relief you're seeking depends on showing that the State court decision was wrong, was wrongly decided. Well, that's certainly the earlier law, but I'm not sure it's the later law. That's what I'm trying to understand, the more recent law. I think it's fair to say that if they're seeking damages, it would be predicated on some declaration of a constitutional violation. Well, then you might have a race-judicata collateral estoppel problem, but why do you have a Rooker-Feldman problem? In other words, the fact findings, the issues that were decided that would be predicates to whatever issues you're raising now might well be preclusive, but why is there a Rooker-Feldman problem? Your Honor, the Rooker-Feldman trial problem because we're asking the Federal State court in order to make a determination about whether or not there was a constitutional violation. These are not broadly based constitutional challenges to statutes, except in some cases that were already race-judicata in the State court or collateral estoppel in the State courts. Right. And really briefly, because we're tight on time, what about the religious discrimination in jail charges? Your Honor, I think that was handled appropriately on summary judgment when, in support of the summary judgment motion, the King County defendants brought in a testimony to the declaration of the jail administrator who explained the policy behind not allowing Ms. Safwan to wear her headscarf while incarcerated and set forth a number of justifiable penological reasons to preclude her having the ability to wear that headscarf, consistent with decisions of this Court and others saying that these are the kinds of penological justifications that outweigh any damage to a religious right to wear a headscarf. Is there any case law at all about this question? Yes, Your Honor, there is.  That specific headscarf, I'm not aware of any, no, Your Honor. But certainly it comes up a lot in the context of Native Americans and their headgear and other, maybe this will be the first one. I don't know.  Yes, Your Honor. There is a State law claim for malicious prosecution which involves the prosecution for obstruction of justice. Yes. The district court dismissed that claim on the footing that probable cause had been shown for the arrest. Probable cause. For the arrest. Therefore, there was probable cause, and that's the end of it. My question is, at least as I understand it, Washington law provides that when a criminal proceeding is dismissed or terminated, that there is a, basically a prima facie case or presumption that probable cause is lacking. And that would be the Peasley case. And there, obviously, because it's all, the way this came up, there is no proffer by the State sort of showing full disclosure to the prosecutor that would trump the dismissal and make it a matter of prosecutorial discretion rather than just the arrest record. And the officer, the trial judge at the time remarked that Barnard, I think his name was, had, in fact, concealed or destroyed documents. So my question is, based on those allegations, which are, I think, paragraphs 139 and 140 of the Second Amendment complaint, why isn't there a claim made out for State law, malicious prosecution? Your Honor, again, I believe that the showing of the probable cause to make the arrest, regardless of whatever other procedural mechanisms attended to whatever disposition there might have been in the ultimate prosecution case, still is the sonic one-off of whether or not there is a malicious prosecution for the arrest that was effected. And the officers who were the defendants in this Federal district court case charged with malicious prosecution are, had probable cause, which is a, to make the arrest based on the factual showing that was made in the district court, which is enough grounds to dismiss that case, or dismiss that charge, excuse me, that claim. In any event, as pendant or ancillary jurisdiction in a State law claim, when the Federal claims are dismissed, the Federal district court should probably not be in the business of malicious prosecution. Yeah, which is a different question altogether. I mean, if the claim survived, he can send it back to State court or decline to exercise supplemental jurisdiction over it. If nothing else survived. This was not removed, Your Honor. The case was not removed from State court. Well, he can decline to exercise supplemental jurisdiction regardless. Well, I see my time is just about out. All right. Thank you. If I might, just in conclusion, I would ask the Court not only to affirm the district court's orders on review here, but also to grant the defendant's, Pelley's motion for judicial notice for all those facts in the public record that help inform the legal dispositive arguments we've made. Thank you. Okay. Thank you. Ms. San Juan. There were a couple of issues that Pelley's counsel raised that Ms. Gunther, as representative of the children in this appeal, wanted to address. I didn't know whether that was appropriate, because I did indicate that I would be doing oral argument, but I wanted to ask if that would be. Well, that ‑‑ she's counsel of record for the kids. She's counsel of record. Well, I suppose it's fine. Yeah, it's fine. I will understand. Your Honors, may it please the Court. My name is Marilyn Gunther, and I have filed an appearance on behalf of the paternal relatives and the children in this matter. I would like to correct one statement. I did not represent the Safflons in the dependency matters. I did not get my law degree and bar number until May the 15th of 1998. Most of the proceedings were completed. After that point, the Court did allow me to sit in as advisory counsel on some of the things. However, the Safflons represented themselves, per se, in that matter. Thank you. Another question. Was the motion for next friend, I think it was in the alternative for guardian and litem, is that right? Correct. And was it limited to these particular people, or was it more open-ended than that? Was the motion to appoint the Moroccan relatives as next friend, or was the motion to appoint someone as next friend? The first motion was to appoint the paternal relatives. The second motion was to appoint any suitable person. As far as I understand it, I still was not a lawyer at that time. But that was done. That was done pro se before I came on board with the case. The other thing that I would like to mention, the defense counsel talked about all of the individual people doing a particular part of their job. I would like to call to the Court's attention that part of our investigation, and particularly my investigation, went to the fact that the legislature in Washington has stated that the guardians at litem shall have certain training and that that training shall be created by certain entities, including the Department of Social and Health Services or designee and the Attorney General's Office or designee. That would have been a big part of this lawsuit because I believe that that leads into the conspiracy claims that were made because I know that those training sessions do happen, and we were gathering the evidence on that at the time when the dismissal came down. So that's all I wanted to say, and I believe Ms. Zafon would like it. Thank you, Ms. Gunther. Zafon, back to you. I have just a few tie-up statements that I'd like to make. I'm kind of in a different position than most attorneys that come before you. I'm not an attorney, and I am one of the actual attorneys. Most of them do not argue nearly as well as you do either. Well, thank you. Any good that comes from me comes from the Lord above. So I've tried to argue the case with some objectivity. Of course, it's difficult. It's very easy to be subjective in this situation, especially as a mother and a wife. I've tried to put out of my mind the callous and the horrendous cruelty that has been done to my family, especially my children. But I still believe I can best state the case to the court by remaining objective as best as I can and do my best to point out to the court, both in writing and orally, what the case law says and how we believe it should be applied. In order to do that, there's research, there's reflection, and there has to be balanced thought. I recognize that. But I can't conceal my concern over the seriousness of what is involved in this case. While it encompasses many, many issues and many, many different individuals, both appellant and appellee, the fundamental and vital issue is so serious and so important that probably it's ever come before this court. And I think this is an area of the law that has become to be more prevalent because I believe people are starting to speak out and starting to stand up when their rights are violated by social service agencies and those that work in concert with them, whether they be GALs or whether it's an issue of the system, the court system itself. As Ms. Gunther indicated, they're trained by the Department of Social and Health Services. The GALs are trained by them. There's no separation where there can be accountability and responsibility to those who do wrong. I realize there's an extremely long period of time that has passed since the events that are raised in our complaint first began in 1994. But I would caution you that there's a saying that wisdom and justice too often never comes, and so one ought not to reject them merely because they come late. And appellate courts are entrusted with an admirable ability to detach themselves from difficult emotional facts and issues in order to decide a case based on the law in a way that promotes justice and fairness. And objectivity and a balanced judgment should not be clouded by appellees exploiting the tragic death of a beautiful young child. And I actually read an article about Judge Arakan. It was one back in 1988, and he made a statement that I think all three of you could keep in mind as you decide this case. He made a statement about the independence of the judiciary, separation from politics, and he said, because we are independent of politics, we are independent of public passion or prejudice. We must not be concerned about the public claimer, about newspaper headlines. We are required to follow the Constitution applied equally to all persons, regardless of how we may be criticized for a decision we make. That was part of the wisdom of the way our U.S. Constitution was drafted to give us independence for life. Thank you. Thank you, counsel. The matter just argued will be submitted.
judges: Alarcon, Rymer, Berzon